**SOUTHERN NATURAL GAS COMPANY and Southern Energy Company, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 84–7563.

United States Court of Appeals, Eleventh Circuit.

Jan. 30, 1986.

James J. Flood, Jr., Flood & Ward, Washington, D.C., for petitioners.

Jeffrey D. Komarow, Harold L. Talisman, Wright & Talisman, Washington, D.C., for Alabama Gas Corp.

Frederic G. Berner, Jr., Sidley & Austin, Washington, D.C., James L. Clegg, Augusta, Ga., for Columbia Nitrogen Corp. and Nipro, Inc.

Andrea Wolfman, Staff Atty., F.E.R.C., Washington, D.C., for respondent.

Paul W. Deihl, Morley, Caskin & Generelly, Stanley M. Morley, Washington, D.C., for Carolina Pipeline Co., Inc.

Paul W. Deihl, Morley, Caskin & Generelly, Joel F. Zipp, Washington, D.C., for South Carolina Elec. and Gas Co.

John T. Miller, Jr., Washington, D.C., for Bd. of Water, Light and Sinking Fund Com'rs of City of Dalton, Ga.

Edward J. Grenier, Sutherland, Asbill & Brennan, Washington, D.C., for Georgia Indus. Group.

Channing D. Strother, Jr., Goldberg, Fieldman & Letham, P.C., Glenn W. Letham, Washington, D.C., for Chattanooga Gas Co.

John T. Stough, Jr., Newman & Holtzinger, P.C., John E. Holtzinger, Jr., Washington, D.C., for Atlanta Gas Light Co.

Joel R. Dichter, Atlanta, Ga., for Georgia Consumers Utility Counsel.

Before TJOFLAT, HENDERSON and HATCHETT, Circuit Judges.

TJOFLAT, Circuit Judge:

Southern Natural Gas Company and Southern Energy Company have petitioned for review of a Federal Energy Regulatory Commission order requiring that they invoke the minimum bill provision of a gas tariff as of June 10, 1980.[1] We affirm the Commission's order.

## I.

In the early 1970's, Southern Energy Company made applications to the Federal Power Commission, the predecessor to the Federal Energy Regulatory Commission,[2] for authorization to import large quantities of liquified natural gas (LNG) from Algeria and to construct a facility at Elba Island near Savannah, Georgia, to receive the LNG and regasify it. The gas would then be sold to Southern Energy's parent, Southern Natural Gas Company, and transmitted by pipeline to Southern Natural's interstate transmission line. The LNG was to be produced by Sonatrach, a corporation owned by the Algerian government, and sold by Sonatrach to El Paso Algeria Corporation, which would transport the LNG overseas by tanker. Southern Energy contracted with El Paso Algeria for the purchase of 350,000 Mcf per day of LNG for a twenty-five year term.

The Commission, citing gas shortage conditions in the United States, issued an opinion on June 28, 1972, authorizing Southern Energy to import annual quantities of approximately 143,718.75 billion Btu of LNG,[3] pursuant to section 3 of the Natural Gas Act, 15 U.S.C. § 717b (1982), and issued

certificates of public convenience and necessity to construct and operate the facility and pipelines necessary for the project, pursuant to section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c) (1982). *Columbia LNG Corp.*, 47 F.P.C. 1624 (Opinion No. 622), *modified*, 48 F.P.C. 723 (1972) (Opinion No. 622–A) (per curiam), *vacated and remanded on other grounds*, 491 F.2d 651 (5th Cir.1974). The Commission simultaneously approved a similar venture to be undertaken by Columbia LNG Corporation and Consolidated System LNG Company involving a Cove Point, Maryland, LNG facility.[4] As a condition to its approval, the Commission rejected, as contrary to the public interest, a part of the rate schedule filed by Southern Energy that would have required the pipeline purchaser to pay the full cost of service regardless of whether LNG deliveries were actually made to the pipeline. *Columbia LNG Corp.*, 47 F.P.C. at 1639–40; *see Columbia LNG Corp.*, 48 F.P.C. at 730. The Commission noted that it was thereby requiring Southern Energy and its shareholders to bear the entire economic risk of the project. The ratepayers were absolved from sustaining the burdens of the project should it prove unsuccessful. 47 F.P.C. at 1640.

Upon applications for rehearing, the Commission affirmed its original opinion in most respects. *Columbia LNG Corp.*, 48 F.P.C. 723 (1972) (Opinion No. 622–A) (per curiam). It did, however, in order to make the project economically feasible, modify some of the conditions it had originally imposed. Noting its earlier condition rejecting full "cost-of-service" tariffs, the Commission decided that it would now permit a minimum bill that allowed the LNG companies to recover certain fixed costs in the event of nondelivery of gas. *Id.* at 730. Under this provision, stockholders of the company would not be allowed a return on

---

1. 15 U.S.C. § 717r(b) (1982) provides that, upon petition from an aggrieved party, the courts of appeals have jurisdiction to review orders of the Commission.

2. *See* 42 U.S.C. §§ 7172(a)(1), 7293 (1982). For convenience, we will refer to both bodies as the "Commission" in this opinion.

3. This quantity corresponds to 350,000 Mcf per day, calculated at 1125 Btu per cubic foot.

4. Because the Cove Point proceedings bear on the proceedings in this case, we will make reference to them throughout this opinion.

equity during any period of nondelivery, but the company could recover its costs. This minimum bill provision was necessary in order for Southern Energy to secure project financing. The Commission stated that "[s]uch tariff provisions are required by the public convenience and necessity as an equitable apportionment of the risk between customers and stockholders and in order to assure the financing of the project on reasonable terms to the consumer." *Id.* The Commission therefore authorized inclusion of a minimum bill provision in Southern Energy's tariff as follows: "In the event that Seller is unable to deliver gas to Buyer during any period exceeding one day, Buyer shall reimburse Seller for all out-of-pocket expenses incurred during such period...." *Id.* at 731.[5]

LNG deliveries from Algeria commenced in March 1978. In 1979, Sonatrach sought a price increase for the LNG it was selling to El Paso Algeria. The companies reached agreement on such an increase, but the Algerian government would not approve it. As a result, LNG shipments from Algeria were stopped as of March 31, 1980. On April 9, Southern Energy received its last shipment of LNG from Algeria, leaving Southern Energy's storage tanks nearly full. Subsequent negotiations at the governmental level and the company level were unavailing, and gas deliveries were not resumed.

Following the cut-off of its LNG supply on April 9, Southern Energy decided to husband its remaining supplies by reducing the quantity of gas it would send out on a daily basis. Gas deliveries were greatly reduced in April 1980, reduced further in May 1980,[6] and by June 1980, deliveries had been reduced to "boil-off" levels.[7]

In August 1980, the Commission initiated an investigation into the rates being charged by Southern Energy.[8] In January 1981, Southern Energy and Southern Natural secured the agreement of most of their resale customers in a conservation plan, which it offered to the Commission as a settlement of the investigation. The plan called for continuing minimal deliveries of

---

5. The full text of the minimum bill provision is as follows:

> In the event that Seller is unable to deliver gas to Buyer during any period exceeding one day, Buyer shall reimburse Seller for all out-of-pocket expenses incurred during such period, limited to the following:
> (a) Operating and maintenance expenses;
> (b) Taxes payable;
> (c) Interest expense based on that portion of Seller's then existing debt which was incurred for the construction of the LNG and related facilities;
> (d) The requirements for repayment of such debt; and
> (e) Amounts, if any, Seller shall be obligated to pay suppliers arising from Buyer's failure to accept deliveries from Seller.
> Provided, however, that Buyer's obligation to pay shall not extend beyond the time at which Seller, if it is the party claiming *force majeure,* could have remedied the cause in an adequate manner with all reasonable dispatch in order to resume deliveries to Buyer.

48 F.P.C. at 731. An identical minimum bill was included in the tariffs of Columbia LNG Corporation and Consolidated System LNG Company.

6. During early April 1980, prior to the Algerian embargo, gas deliveries from Elba Island averaged 182,000 MMBtu per day, with a high of

227,000 MMBtu and a low of 125,000 MMBtu, and were consistent with historical deliveries. In March 1980, deliveries had averaged 284,000 MMBtu. On April 10, 1980, the day after the last shipment of gas from Algeria was received, 47,586 MMBtu were delivered. Deliveries during the rest of April were in the 15,000 MMBtu range and were reduced to 10,000 MMBtu in May. *See Southern Natural Gas Co.,* 28 F.E.R.C. ¶ 61,240, at 61,453 (1984) (Opinion No. 222–A); *Southern Natural Gas Co.,* 27 F.E.R.C. ¶ 61,322, at 61,603 (1984) (Opinion No. 222) (modified by Opinion No. 222–A).

7. "Boil-off" is natural gas that is spontaneously converted from a liquid to a gaseous state as a result of normal heat leaks in the piping. "Boil-off" volumes at the Elba Island facility were approximately 2000–3000 MMBtu per day.

8. This proceeding began when the People's Counsel of Maryland and the Attorney General of Ohio filed complaints with the Commission, alleging that Columbia LNG and Consolidated System LNG failed to invoke the minimum bill provisions of their tariffs in a timely manner. Because the language of Southern Energy's minimum bill is identical to that found in the Columbia LNG and Consolidated System LNG tariffs and arose out of the same proceedings, the Commission *sua sponte* included Southern Energy in its investigation.

gas in order to have supplies available for emergency and winter use. Southern Energy could continue to bill the full cost of service as long as it maintained a specified quantity of gas in storage. When gas levels dropped below that specified quantity, Southern Energy would be required to invoke the minimum bill. Southern Energy operated under this procedure pending the completion of the investigation and ultimately invoked the minimum bill on April 15, 1982.[9]

On March 5, 1982, the administrative law judge (ALJ) issued an initial decision finding that Southern Energy had complied with its minimum bill provision. *Columbia Gas Transmission Corp.*, 18 F.E.R.C. ¶ 63,060 (1982).[10] The ALJ found the minimum bill, which had to be invoked when the seller is "unable to deliver gas," clear and unambiguous. *Id.* at 65,191. The ALJ focused on the company's *ability* to deliver gas. Because Southern Energy had the ability to deliver gas at all times following the embargo, it was not required to invoke the minimum bill. Moreover, Southern Energy was not only *able* to deliver gas, but had in fact done so, "albeit in minimal volumes consisting only of boil-off." *Id.* The ALJ thus read the phrase "unable to deliver gas" literally, holding that although it might be a simplistic interpretation, the phrase "means precisely what it states." *Id.* at 65,190. The *ability* to deliver *gas,* in any quantity, suffices to prevent application of the minimum bill.[11]

In the Commission's first opinion concerning the minimum bill, the proceeding involving Southern Energy was severed from similar proceedings involving Columbia LNG and Consolidated System LNG because of Southern Energy's proposed settlement. *Columbia Gas Transmission*

*Corp.,* 25 F.E.R.C. ¶ 61,460, at 62,000 (1983) (Opinion No. 202), *vacated,* 27 F.E.R.C. ¶ 61,089 (Opinion No. 202–A), *modified,* 28 F.E.R.C. ¶ 61,053 (1984) (Opinion No. 202–B), *aff'd,* 771 F.2d 1536 (D.C.Cir. 1985). In the same opinion, the Commission addressed the interpretation of the minimum bill in the Columbia LNG and Consolidated System LNG tariffs. The Commission, agreeing with the ALJ, found the minimum bill unambiguous and held that the *ability* to deliver *any* quantity of gas, however small, sufficed to prevent implementation of the minimum bill. *Id.* at 62,005–06. The Commission did not, however, end the inquiry there. It determined that the pipeline companies had acted imprudently by failing to demand delivery of pre-embargo quantities of gas, as called for in their contracts, and ordered the pipelines to refund to their customers the difference between what would have been paid under a minimum bill tariff and what was actually paid under the full cost of service tariff.

On rehearing, the Commission vacated its decision in Opinion No. 202 and adopted a different mode of analysis, *Columbia Gas Transmission Corp.,* 27 F.E.R.C. ¶ 61,089 (1984) (Opinion No. 202–A). The Commission found a "substantial basis for the existence of ambiguity" in the language of the minimum bill tariff. *Id.* at 61,166. Looking at the tariff as a whole rather than focusing solely on the minimum bill, the Commission noted that the tariff called for the delivery of gas at "contract demand levels," approximating 300,000 Mcf per day in the case of Columbia LNG.[12] In light of this provision, the phrase "unable to deliver gas" in the minimum bill was not self-defining because it did not make any reference to quantity. The Commission therefore looked to extrin-

---

**9.** Because of differences in their systems, Columbia LNG and Consolidated System LNG had to empty their storage tanks much sooner than Southern Energy and thus invoked their minimum bills in December 1980.

**10.** The ALJ similarly found that Columbia LNG and Consolidated System LNG had complied with their minimum bill tariffs.

**11.** The ALJ also stated that the settlement proposed by Southern Energy was reasonable and should be accepted to the extent that it provided an agreed upon formula for implementing the minimum bill provision "earlier than might otherwise be necessary." 18 F.E.R.C. at 65,192.

**12.** The contract demand level was 350,00 Mcf per day for the Southern Energy project.

sic factors to give meaning to the phrase, primarily the sequence of events leading to the incorporation of the minimum bill provision in the tariff. The intent of the minimum bill had been to balance the risk between shareholders and ratepayers in the event of a supply interruption. *Id.* at 61,-168. Upon such an occurrence, the company could recover its costs, a feature that was necessary in order to secure debt financing, but the ratepayers would not be required to provide a return for the equity shareholders. This analysis led the Commission to the conclusion that delivery of gas at approximately the level certificated when the project was approved was necessary to forestall implementation of the minimum bill. *Id.*[13] An interpretation of the minimum bill that would allow the company to deliver no gas, or minimal levels of gas, at its option, so long as the *ability* to deliver any quantity of gas existed, and require ratepayers to pay the full cost of service while not receiving the benefits contemplated by the project would be contrary to the Commission's intent when it originally approved the projects in Opinion No. 622–A. *Id.*[14]

The Commission issued its initial decision in the Southern Energy proceeding on May 30, 1984. *Southern Natural Gas Co.,* 27

F.E.R.C. ¶ 61,322 (Opinion No. 222), *modified,* 28 F.E.R.C. ¶ 61,240 (1984) (Opinion No. 222–A). Relying on its earlier opinion in the Columbia LNG proceeding involving an identical minimum bill tariff, the Commission concluded that Southern Energy should have invoked its minimum bill when it ceased to deliver gas in significant quantities.[15] Because the Commission concluded that the minimum bill should have been invoked shortly after the embargo began, it rejected as against the public interest the proposed settlement which allowed Southern Energy to postpone implementing the minimum bill for almost two years.

Southern Energy and Southern Natural have petitioned for review of the Commission's order, claiming that the Commission's interpretation of the minimum bill tariff did not constitute reasoned decision making based on substantial evidence. The petitioners contend that the minimum bill is clear and unambiguous on its face and that substantial evidence was therefore lacking for the Commission's finding that the minimum bill was ambiguous and its subsequent resort to extrinsic factors to interpret the provision. The petitioners also claim that, even assuming that reliance on extrinsic evidence was proper, the

**13.** The Court of Appeals for the District of Columbia Circuit has upheld the Commission's interpretation of the minimum bill tariff in the Columbia LNG proceeding. *Consolidated Gas Transmission Corp. v. FERC,* 771 F.2d 1536 (D.C. Cir.1985).

**14.** As the Commission noted, "the whole purpose of the LNG importation projects and FPC's approval of them was to provide substantial, base load supplies of gas at a time when conventional gas supplies were very short." *Columbia Gas Transmission Corp.,* 27 F.E.R.C. at 61,167.

**15.** The Commission originally held that the minimum bill should have been invoked on June 30, 1980, relying on its reasoning in the Columbia LNG proceeding. *Southern Natural Gas Co.,* 27 F.E.R.C. at 61,605. The Commission arrived at this date by noting that it was in early May when it became evident that the embargo would continue indefinitely. Southern Energy stopped delivering significant quantities of gas at that time. The Commission determined that it would take another six to seven weeks to complete the technical procedures necessary to employ the terminal, thus arriving at June 30, 1980, as the date for implementing the minimum bill. *See Columbia Gas Transmission Corp.,* 27 F.E.R.C. at 61,168–69. Upon rehearing in the Columbia LNG proceeding, the Commission determined that LNG deliveries began their dramatic decline on April 1, 1980, and found that six to eight weeks were needed to shut down the facility. The Commission therefore decided that the minimum bill should have been invoked on May 31, 1980. *Columbia Gas Transmission Corp.,* 28 F.E.R.C. ¶ 61,053, at 61,099 (1984) (Opinion No. 202–B), *aff'd,* 771 F.2d at 1548–50. Upon rehearing in the Southern Energy proceeding, the Commission reassessed the date for invoking the minimum bill. It found that gas delivery levels were reduced substantially as of April 10, 1980, and given the six to eight week shut down period, the Commission determined that the minimum bill should have been invoked on June 10, 1980. *Southern Natural Gas Co.,* 28 F.E.R.C. ¶ 61,240, at 61,453 (1984) (Opinion No. 222–A). Southern Energy has not taken exception with the precise date the Commission determined the minimum bill provision should have been invoked.

Commission's findings are not supported by substantial evidence. Finally, petitioners contend that the Commission lacked a reasoned basis for rejecting the settlement offer. We find the Commission's order to be based on substantial evidence and to constitute a reasoned exercise of its statutory mandate to regulate the transportation and sale of natural gas.

## II.

■ The construction of the minimum bill tariff is within the primary jurisdiction of the Commission. *See United States v. Western Pacific Railroad,* 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). As the Supreme Court has emphasized, "Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise." *In re Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968); *see South Georgia Natural Gas Co. v. FERC,* 699 F.2d 1088, 1090 (11th Cir.1983). The Commission's interpretation of the tariff need not be the only reasonable one or even the one that we would necessarily reach if we were to decide the issue initially; if the Commission's interpretation of the tariff is reasonable, it must be upheld. *American Paper Institute v. American Electric Power Service Corp.,* 461 U.S. 402, 422–23, 103 S.Ct. 1921, 1933, 76 L.Ed.2d 22 (1983).[16]

■ In construing a tariff, it is appropriate to look at the four corners of the tariff and consider the instrument as a whole. *United States v. Missouri-Kansas-Texas Railroad,* 194 F.2d 777, 778 (5th Cir.1952). The tariff here called for the scheduling of daily deliveries of gas at the contract demand level, specified in the service agreement as approximately 350,000

Mcf. It further provided that departures from scheduled deliveries should be kept to a minimum and balanced out as soon as practicable and that daily deliveries were to be, as nearly as practicable, at a uniform hourly rate of flow. The minimum bill was to take effect when the seller was "unable to deliver gas," but did not make any reference to quantity of gas. In light of the quantity of gas deliveries contemplated by the tariff, the Commission's determination that the minimum bill was ambiguous cannot be said to be unreasonable.

■ The tariff must also be examined in the context of the circumstances leading to its adoption. "[T]o decide the question of the scope of [a] tariff without consideration of the factors and purposes underlying the terminology employed would make the process of adjudication little more than an exercise in semantics." *United States v. Western Pacific Railroad,* 352 U.S. at 67, 77 S.Ct. at 167. Viewing the minimum bill in isolation without regard to the commercial context in which it arose would indeed be an "exercise in semantics." *Id.; see Pennzoil Co. v. FERC,* 645 F.2d 360, 388 (5th Cir.1981), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982).

■ The Commission initially approved Southern Energy's Elba Island project in order to provide substantial supplies of gas at a time when shortage conditions existed and were expected to continue. *See supra* note 14; *see also Columbia LNG Corp.,* 47 F.P.C. at 1636. In its first opinion approving the project, the Commission rejected a tariff that would have required the ratepayers to pay the full cost of service whether any LNG was delivered or not. 47 F.P.C. at 1639. By rejecting this provision, the entire risk of the project was placed on the equity shareholders. *Id.* at 1640. The ratepayers would not have to bear *any* of the costs if the project did not succeed.

---

**16.** It is the Commission's final decision and the reasoning it expressed in support of that decision which we review. *City Service Gas Co. v. FERC,* 623 F.2d 1002, 1004 (5th Cir.1980) (in *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981). The fact that the Commission or the ALJ initially reached a determination that was ultimately reconsidered is therefore of little consequence.

After the receipt of applications for rehearing, the Commission reconsidered its decision and modified some of the conditions it had previously imposed so that the project would be economically feasible. *Columbia LNG Corp.*, 48 F.P.C. at 725. The Commission continued to find a full cost of service tariff unacceptable, but was persuaded that a minimum bill which allowed the recovery of fixed costs in the event of nondelivery of gas, but not a return on equity, was necessary. Such a provision would equitably apportion the risks between ratepayers and stockholders. *Id.* at 730.

The construction of the minimum bill urged by petitioners would render this careful balancing conducted by the Commission a nullity. The ratepayers would be required to pay the full cost of service as long as Southern Energy had the *ability* to deliver some minimal quantity of gas, even if no gas was being delivered. The ratepayers would not, however, be receiving any of the benefits contemplated by the project. This would not appear to be the "equitable apportionment" of risk required by the Commission. The Commission's interpretation, requiring the delivery of gas in substantial quantities in order to prevent the invocation of the minimum bill, as contemplated by the tariff as a whole and the proceedings whereby the project was initially certificated, meets the standard of reasonableness and constitutes reasoned decision making.[17]

■ Having determined that the minimum bill was required to be invoked on June 10, 1980, *see supra* note 15, the Commission rejected the settlement proposed by Southern Energy which would have allowed a delay of nearly two years in invoking the minimum bill. The Commission's determination that the proposed settlement was contrary to the public interest was certainly reasonable. The settlement would have required the ratepayers to pay the full cost of service for two years longer than the tariff called for, a result reasonably found not to be in the public's interest.

For the foregoing reasons, we affirm the Commission's order requiring Southern Energy to invoke its minimum bill as of June 10, 1980.

AFFIRMED.

---

**17.** The petitioners maintain that the conservation program they adopted, allowing for the availability of gas for high-priority uses, was prudent and reasonable. The issue of the prudence of petitioners' actions in disposing of the stored gas is separate from the issue concerning the proper rates to be charged. As the Commission stated, "the question of prudence ... is ... immaterial in these proceedings." *Columbia Gas Transmission Corp.*, 27 F.E.R.C. at 61,166. The terms of the minimum bill dictate that, in the event of nondelivery of gas, the company can recover its costs but not a return on equity, no matter how prudent its actions. *See Consolidated Gas Transmission Corp. v. FERC*, 771 F.2d at 1547–48.