SOUTHERN NATURAL GAS COMPANY
and Southern Energy Company,
Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondents.

No. 85–7327.

United States Court of Appeals,
Eleventh Circuit.

March 30, 1987.

James J. Flood, Jr., Flood & Ward, Washington, D.C., for Southern Natural Gas.

Andrea Wolfman, Staff Atty., Joseph S. Davies, F.E.R.C., Washington, D.C., for F.E.R.C.

Channing D. Strother, Jr., Washington D.C., for Chattanooga Gas Co.

John T. Stough, Jr., John E. Holtzinger, Jr., Newman & Holtzinger, P.C., Washington, D.C., for Atlanta Gas Light Co.

Jeffrey D. Komarow, Wright & Talisman, P.C., Washington, D.C., for Alabama Gas Corp.

Stanley M. Morley, Paul W. Diehl, Washington, D.C., for South Carolina Pipeline Corp.

Frederic G. Berner, Jr., Sidley & Austin, Monica A. Schwebs, Washington, D.C., for Columbia Nitrogen Corp. & Nipro, Inc.

Deppish Kirkland, Atlanta, Ga., for Consumers' Utility Counsel of Georgia.

Before RONEY, Chief Judge, TJOFLAT and HATCHETT, Circuit Judges.

TJOFLAT, Circuit Judge:

This case concerns refunds the Federal Energy Regulatory Commission (Commission) ordered following our opinion in *Southern Natural Gas Co. v. FERC*, 780 F.2d 1552 (11th Cir.1986). In that case, we upheld the Commission's determination that Southern Natural Gas Company (Southern)[1] had collected excess tariffs from its customers by failing to invoke a price limiting provision in its natural gas tariff. The Commission had also ordered Southern to provide full refunds to its customers for the excess money they paid between June 10, 1980, the date the Com-

mission determined that Southern should have invoked the price limiting provision, and April 15, 1982, the date on which Southern actually invoked that provision. Southern now seeks review of the Commission's decision that Southern provide full refunds to all of its customers.

I.

Early in the 1970s, Southern applied to the Federal Power Commission[2] for permission to import liquified natural gas (LNG) from Algeria, and to construct a facility near Savannah, Georgia, to regasify the LNG. Southern planned to transport the regasified LNG through a pipeline and sell it to various energy companies. The Commission, citing domestic gas shortages, approved Southern's plan, but it rejected the part of Southern's proposed tariff that would have required purchasers to pay for the full cost of service, including a return on Southern's capital investment in the LNG facility, even if Southern did not deliver any gas. *See generally Southern Natural Gas Co. v. FERC*, 780 F.2d 1552 (11th Cir.1986). Eventually, in order to make construction of the LNG facility economically feasible, the Commission authorized Southern to include in its tariff a "minimum bill" provision that would enable Southern to recover from its customers some of its fixed costs when gas was not delivered. The minimum bill, however, precluded Southern from receiving any return on equity.[3] This arrangement, the Com-

1. Southern Energy Company, a subsidiary of Southern Natural Gas Company, was a party in that earlier case, *Southern Natural Gas Co.*, 780 F.2d at 1554, as it is here. The Commission's order that we review in this case required Southern Natural Gas Company and Southern Energy Company to pay full refunds to all of their customers. Because Southern Energy Company and Southern Natural Gas Company are co-petitioners in this case and share the same interests, we refer to them jointly as "Southern" throughout this opinion.

2. The Federal Power Commission's duties have been assumed by the Federal Energy Regulatory Commission. *See* 42 U.S.C. §§ 7172(a)(1), 7293 (1982). For convenience, we refer to both agencies as the Commission.

3. The minimum bill provision stated as follows:

In the event that Seller is unable to deliver gas to Buyer during any period exceeding one day, Buyer shall reimburse Seller for all out-of-pocket expenses incurred during such period, limited to the following:

(a) Operating and maintenance expenses;

(b) Taxes payable;

(c) Interest expense based on that portion of Seller's then existing debt which was incurred for the construction of the LNG and related facilities;

(d) The requirements for repayment of such debt; and

(e) Amounts, if any, Seller shall be obligated to pay suppliers arising from Buyer's failure to accept deliveries from Seller.

Provided, however, that Buyer's obligation to pay shall not extend beyond the time at which Seller, if it is the party claiming *force*

mission concluded, "equitabl[y] apportion[ed] ... the risk [of an Algerian oil and gas embargo] between [Southern's] customers and [its] stockholders and ... assure[d] the financing of the project on reasonable terms to the consumer." *Id.* at 1555 (quoting *Columbia LNG Corp.*, 48 F.P.C. 723, 730 (1972) (Opinion No. 622–A) (per curiam)).

Southern began receiving LNG from Algeria in 1978. Soon thereafter, a problem arose when Southern and its Algerian supplier negotiated a price increase. The Algerian government refused to approve the price increase, and the supplier stopped shipping the LNG. Southern received its last LNG shipment on April 9, 1980. To conserve its supply of stored gas, Southern greatly reduced the amount of gas it supplied to its customers; by June 1980, Southern was delivering only one to two percent of the amount of gas that it had been delivering just prior to the termination of the Algerian shipments.

In August 1980, the Commission began investigating Southern's LNG tariff, as part of an investigation involving another company with an identical minimum bill provision in its tariff. In January 1981, most of Southern's customers agreed to a husbanding plan, which called for Southern to continue to deliver only minimal amounts of gas and to store the remainder for winter or emergency use. Under this settlement, Southern would bill its full cost of service, including a return on Southern's capital investment, as long as it stored a certain amount of gas. If the stored quantity of gas dropped below a certain level, Southern would invoke the minimum bill. Southern sought the Commission's approval of the 1981 settlement. While the matter was pending before the Commission,

Southern, on April 15, 1982, invoked the minimum bill.

The Commission did not approve the 1981 settlement. Instead, after several administrative hearings, the Commission ruled that Southern should have invoked its minimum bill on June 10, 1980, when it stopped delivering gas in substantial amounts. In Opinion No. 222, the Commission therefore rejected the 1981 settlement, which, as noted, allowed Southern to delay invoking the minimum bill, as being against the public interest. *See Southern Natural Gas Co.*, 27 F.E.R.C. ¶ 61,322, at 61,605 (Opinion No. 222), *modified*, 28 F.E.R.C. ¶ 61,240 (Opinion No. 222–A) (1984). *See generally Southern Natural Gas*, 780 F.2d at 1556–57 & nn. 10–15.

The Commission's decision that Southern failed timely to invoke the minimum bill provision meant that for almost two years Southern had collected a greater amount of money than its tariff authorized. To remedy this situation, the Commission ordered Southern to prepare a plan under which Southern's customers who had not agreed to the 1981 settlement, and non-consenting consumers of those of Southern's customers who had agreed to the plan, would receive full refunds.[4] *See Southern Natural Gas Co.*, 27 F.E.R.C. ¶ 61,322, at 61,605–06, *modified*, 28 F.E.R.C. ¶ 61,240 (1984).

As Southern was preparing its refund plan, it petitioned this court to review the Commission's decision that Southern had delayed implementing the minimum bill. While we were entertaining that petition, Southern submitted a plan to the Commission that gave full refunds to two customers, and minimal refunds to all others, whom Southern deemed to have been direct or indirect consenting parties to the 1981

*majeure*, could have remedied the cause in an adequate manner with all reasonable dispatch in order to resume deliveries to Buyer.
*Columbia LNG Corp.*, 48 F.P.C. 723, 731 (1972) (Opinion No. 622–A) (per curiam), *vacated and remanded on other grounds*, 491 F.2d 651 (5th Cir.1974).

**4.** In Opinion 222, the Commission stated that Southern's customers who had consented to the 1981 settlement "*may* have perceived benefits"

from the settlement and that full refunds to those customers might therefore be inappropriate. *Southern Natural Gas Co.*, 27 F.E.R.C. ¶ 61,322 at 61,606 (emphasis added). In Opinion 222–A, the Commission emphasized that it had not yet finally decided whether all of Southern's customers should receive full refunds. *Southern Natural Gas Co.*, 28 F.E.R.C. ¶ 61,240 at 61,452.

settlement.[5] Many of Southern's customers objected to the company's proposed refund plan, arguing that Southern's consenting and non-consenting customers had received the same service under the 1981 settlement; thus, consenting customers had received no benefit that would justify their getting less than full refunds.[6] The Commission agreed with these objections, and issued an order rejecting Southern's plan and ordering full refunds to all customers. *See Southern Natural Gas Co.,* 30 F.E.R.C. ¶ 61,080 (1985). In that opinion, the Commission stated that opponents of Southern's plan had convinced it that consenting and non-consenting customers had received the same benefit during the time Southern was conserving its LNG supplies, and thus should be treated equally for purposes of a refund. Furthermore, the Commission believed that denying full refunds to consenting customers would penalize them for having earlier agreed to the 1981 settlement, which would be contrary to its policy of encouraging settlements.

Southern petitioned this court to review the Commission's order requiring full refunds. We stayed that proceeding pending our disposition of Southern's first petition, involving the validity of the Commission's decision that Southern did not timely invoke its minimum bill and that the 1981 settlement was contrary to the public interest. In *Southern Natural Gas,* 780 F.2d at 1559, we upheld that decision. We now affirm the Commission's decision ordering Southern fully to refund the excess revenue it collected during the nearly two years that it operated without invoking the minimum bill.

## II.

### A.

■ When a company that is regulated by the Commission collects fees greater than that its tariff rate permits, the Commission has the authority to order refunds to the company's customers. *See Federal Power Comm'n v. Tennessee Gas Transmission Co.,* 371 U.S. 145, 154–55, 83 S.Ct. 211, 216–17, 9 L.Ed.2d 199 (1962). In *Southern Natural Gas Co. v. FERC,* 780 F.2d 1152 (11th Cir.1986), we upheld the Commission's decision that Southern should have invoked its minimum bill provision almost two years before it did. As a result of its delay in invoking its minimum bill, Southern received excess tariffs of about 19.4 million dollars. Following our holding in *Southern Natural Gas,* the Commission ordered Southern to refund 11.2 million dollars to its customers.[7]

In reviewing a FERC order,

> our responsibility is to determine (1) whether the Commission abused or exceeded its authority; (2) whether each essential element of the Commission's order is supported by substantial evidence; and (3) whether the Commission has given reasoned consideration to each of the pertinent factors in balancing the needs of the industry with the relevant public interests.

*Peoples Gas Light & Coke Co. v. FERC,* 742 F.2d 1109, 1111–12 (7th Cir.1984) (citation omitted). Southern contends that the Commission ignored the relevant factors when it decided to order full, rather than limited, refunds. Southern submits that its

5. Southern's refund plan would have paid a total of $257,957.00 to the customers it deemed non-consenting to the 1981 settlement. In addition, in order to settle the case, Southern offered slightly over two million dollars for its remaining customers to share. After rejecting Southern's plan, the Commission ordered that Southern refund slightly over eleven million dollars to its customers.

6. Some of Southern's consenting customers had presented objections to the Commission when it first suggested that Southern treat consenting and non-consenting customers differently. Until Southern submitted the plan the agency ultimately disapproved, however, the Commission treated those objections as premature. *See supra* note 4.

7. From the 19.4 million dollars that Southern had received due to its delay in invoking the minimum bill, the Commission subtracted 8.2 million dollars that Southern previously had collected from Boston Gas Company and credited to its customers. Southern had provided Boston Gas with emergency service during the time Southern was operating under the 1981 settlement.

customers received benefits from the continuing, albeit minimal, operations of the LNG terminal, and that those customers would be doubly benefited were they to receive a full refund from Southern. Southern argues that the Commission abused its discretion by not considering this factor when it rejected Southern's settlement offer and refund plan in favor of an across-the-board refund to Southern's customers.

 The Commission must "give due weight to considerations of equity" when ordering a refund, *Gillring Oil Co. v. FERC*, 566 F.2d 1323, 1325–26 (5th Cir.) (citation omitted), *cert. denied*, 439 U.S. 823, 99 S.Ct. 91, 58 L.Ed.2d 115 (1978),[8] but "[t]he ultimate balance of equitable consideration is committed to the Commission's discretion." *Id.* at 1326 (citation omitted). We believe that the Commission's relevant orders demonstrate that the Commission did consider the equitable claims Southern raises in opposition to the refund, and find no abuse of discretion in the agency's decision.[9]

As Southern conceded at oral argument, the heart of its objection is that some Southern customers will receive an undeserved windfall if the company gives them full refunds. According to Southern, most of its customers entered the 1981 settlement delaying the minimum bill invocation date because they preferred to have Southern store the gas for availability in the event of an emergency need. Thus, the excess tariffs Southern collected from 1980–82 were "insurance premiums" which Southern's consenting customers volun-

tarily paid. To support this argument, Southern claims that it had no obligation to keep the LNG facility open, and that its customers paid less to have Southern store the LNG than had Southern distributed the gas and let its customers handle storage.[10] It is this equitable consideration—that customers who agreed to and enjoyed a type of energy insurance will be given a retroactive "free ride" if Southern refunds to them the excess tariffs it collected—that Southern claims the Commission failed to consider.

In *Southern Natural Gas Co.*, 27 F.E.R.C. ¶ 61,322, at 61,605–06 (Opinion No. 222), *modified*, 28 F.E.R.C. ¶ 61,240 (Opinion No. 222–A) (1984), the Commission rejected Southern's proposed settlement with its customers and ordered Southern to submit a plan establishing a method of refunding the overpayments that Southern had received. In its opinion, the Commission noted that those customers who had agreed to the rejected settlement plan had presumably done so out of self-interest. If these customers had perceived benefits from the rejected settlement, then "the full measure of refunds for these customers *may not* be appropriate." *Southern Natural Gas Co.*, 27 F.E.R.C. at 61,606 (emphasis added). In *Southern Natural Gas Co.*, 28 F.E.R.C. ¶ 61,240, at 61,452 (Opinion No. 222–A) (1984), the Commission reaffirmed this conclusion, and rejected applications for rehearing by some of Southern's customers, on the ground that the customers' arguments were premature because Southern had not yet submitted a refund plan.

---

**8.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**9.** This court may not consider Southern's objection to the Commission's order "unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." 15 U.S.C. § 717r(b) (1982). The Commission suggests that there is some question about whether Southern raised its argument, in its application for rehearing, that its consenting customers would receive a double benefit if they

got full refunds from Southern. Although we would agree that Southern presented its argument to the Commission in a much vaguer fashion than it did before this court, we note that the Commission addressed the argument Southern now raises when it denied Southern's application for rehearing. We therefore conclude that Southern's argument in its application for rehearing was sufficient to meet section 717r(b)'s goal of allowing the Commission to consider an objection before it is judicially reviewed.

**10.** Southern's argument assumes that its customers would have chosen to "self-insure" by storing the gas.

When the Commission rejected Southern's refund apportionment plan and instead ordered full refunds, it again weighed the significance of any benefits that Southern's consenting customers may have received during 1980–82. In its order, the Commission stated that those customers' comments in opposition to partial refunds had persuaded it

> that there is no rationale for distinguishing between consenting and non-consenting customers when considering the service received. The benefit that the Commission surmised that the signatories to the 1981 settlement perceived is unquantifiable by us. The comments correctly point out that the husbanding of LNG affected all of Southern's customers equally. The customers that consented to the 1981 settlement did not receive any more LNG than they would have if they had not consented.

*Southern Natural Gas Co.*, 30 F.E.R.C. ¶ 61,080, at 61,142. Our review of the Commission's final refund order and its history demonstrate that the Commission did not abuse its discretion to consider relevant factors when making its decision. We therefore turn to Southern's second contention, that the Commission's decision to order full refunds to Southern's customers was itself an abuse of discretion.

### B.

■ We do not review a Commission decision to determine whether this court would have reached the same conclusion. *See Southern Natural Gas Co. v. FERC,* 780 F.2d 1552, 1558 (11th Cir.1986); *Florida Gas Transmission Co. v. FERC,* 741 F.2d 1307, 1309–10 (11th Cir.1984). Instead, we must decide only whether the agency's action is so unreasonable as to constitute an abuse of discretion. *See In re Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 791, 88 S.Ct. 1344, 1360, 1373, 20 L.Ed.2d 312 (1968); *Southern Natural Gas,* 780 F.2d at 1558; *Public Serv. Comm'n v. Economic Regulatory Admin.,* 777 F.2d 31, 36 n. 6 (D.C.Cir.1985). In the present case, the Commission's decision to order full refunds to Southern's

customers is not so unreasonable as to be an abuse of discretion.

Southern collected excess tariffs by delaying the invocation of its minimum bill provision for nearly two years. Although most of Southern's immediate customers consented to this action in a settlement agreement, this court subsequently upheld the Commission's decision to reject this settlement. Southern is therefore in the unenviable position of having to argue that it is entitled to retain excess tariffs it collected under an agreement inconsistent with its approved tariff and against the public interest. Although we recognize that some cases will present facts mitigating against refunds of excessive tariffs a gas supplier collects, *see Public Serv. Comm'n,* 777 F.2d at 34–38, we find that the Commission relied on substantial evidence to conclude that refunds were an appropriate remedy in this case. *See Consolidated Gas Transmission Corp. v. FERC,* 771 F.2d 1536, 1540 (D.C.Cir.1985) (the Commission has "broad powe[r] to fashion discretionary relief" when its decision is based on substantial evidence).

■ Southern does not contend that the Commission abused its discretion by ordering full refunds to those Southern customers who did not consent to the 1981 settlement agreement, but it argues that consenting customers received a type of "energy insurance," including the benefit of having Southern store the LNG. Southern does not, however, dispute the Commission's conclusion that the company treated all of its customers equally following that settlement, including those who opposed the agreement. The Commission determined that because both consenting and non-consenting customers received the same treatment during 1980–82, any benefit the consenting companies might have received was "unquantifiable." Thus, it concluded that it had no reason to order a lesser refund to consenting customers than to non-consenting customers. The Commission also found that in light of the equal service Southern provided consenting and non-consenting customers, ordering lesser refunds for consenting customers would

appear to penalize those customers for entering into a settlement, contrary to its policy of encouraging settlements. *Cf.* 18 C.F.R. § 385.601 (1986) (establishing procedures for settlements).

We find the Commission's decision to be reasonable and supported by the evidence. Because all of Southern's customers benefited equally from the 1981 settlement, under which Southern collected an amount greater than the authorized tariffs, the Commission did not abuse its discretion by ordering full refunds for all of Southern's customers. Although Southern understandably preferred the refund scheme the Commission had earlier suggested that it might accept, distinguishing between consenting and non-consenting customers, it has not demonstrated that the Commission's decision ultimately to insist upon a much more substantial refund plan was irrational. Finding no abuse of discretion, we affirm the order.

AFFIRMED.